**UNITED STATES of America, Plaintiff-Appellant,**

**v.**

**George M. VERRUSIO, Defendant-Appellant.**

**No. 83–2109.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1984.

Decided Aug. 29, 1984.

Rehearing and Rehearing En Banc Denied Dec. 3, 1984.

Kennard P. Foster, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff-appellant.

Richard Kammen, McClure, McClure & Kammen, Indianapolis, Ind., for defendant-appellant.

Before CUMMINGS, Chief Judge, FLAUM, Circuit Judge, and PARSONS, Senior District Judge.*

PARSONS, Senior District Judge.

The sole issue presented for review in this Court is whether the district court erred in granting Defendant George M. Verrusio's motion to suppress evidence consisting of approximately 700 grams of cocaine. This evidence was seized by narcotics agents from Verrusio when he arrived at the Weis-Cook Airport in Indianapolis. He had flown there from Miami. Jurisdiction for this appeal is provided by 18 U.S.C. § 3731, which allows the United States government to appeal an order of the district court suppressing evidence when the United States Attorney for that district certifies to the trial court that the appeal is not taken for the purposes of delay and that the evidence is substantial proof of a fact material in the proceedings.

## I.

On December 19, 1977, the Appellee, George Verrusio and a traveling companion, one Thomas Smith were observed at the Miami International Airport by two narcotics officers of the Dade County Sheriff's Department who purportedly had been trained in picking out from a crowd persons who fit a so-called "drug courier profile". This "drug courier profile" is an abstract of physical characteristics claimed to be common among persons transporting drugs illegally. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1322 n. 2, 75 L.Ed.2d 229 (1983). The county officers concluded that Verrusio and Smith, who were waiting to board a plane for Indianapolis, matched this profile. After question-ing them, the officers determined that Verrusio and Smith had paid for their tickets in cash, that Verrusio had taken his ticket out under an alias, and that both of them had been in Florida visiting a friend, though neither could remember the friend's name nor where he lived. The officers also determined that Verrusio had checked one suitcase aboard the plane and that he was carrying a shoulder bag in which there was a "coke spoon", a small utensil used to inhale cocaine through the nostrils. There was a residue of white powder on the "coke spoon".

Although these observations served to confirm the suspicions of the Dade County officers that Verrusio and Smith probably were drug couriers, the officers considered their observations insufficient to justify a warrantless arrest. They allowed the two men to board the plane. When the plane was in the air the officers contacted the police unit at the Indianapolis airport. They in turn contacted Special Agent McGivney of the Federal Drug Enforcement Administration office in Indianapolis. He took over the case. McGivney planned to stop Verrusio and Smith but only after they had claimed the suitcase. McGivney's officers positioned themselves at both the arrival gate and the baggage claim area.

The plane arrived in Indianapolis at 9:15 p.m. Smith, after coming through the arrival gate, managed to elude any further surveillance. Verrusio, however, did not. He proceeded to the baggage claim area, looking about as if to see if he was being watched. Eventually he picked up his suitcase, after it had gone around the carousel several times, and then he made his way hurriedly to the exit. McGivney rushed to catch him and did intercept him at the vestibule area. McGivney stopped him by placing a hand on his shoulder, identifying himself and another of his officers and directing him to accompany them to the airport police offices. These offices were

* The Honorable James B. Parsons, Senior District Judge for the Northern District of Illinois, Eastern Division, sitting by designation.

some 50 to 70 feet away. Along the way they did not talk. After they had entered the inner room of the two rooms of the office, McGivney told Verrusio that they had received information indicating that he was carrying contraband in his suitcase and that they wanted to look into the suitcase "if it was agreeable to him". He agreed. They looked. Then he was "formally" arrested and later indicted.

It is important to note at this point that there have been two hearings on Verrusio's motion to suppress: one in 1979 before Judge Noland and one in June of 1983 before Judge Steckler, both of the same court. Judge Noland denied the motion to suppress. Before the matter went to trial, however, and as a result of plea bargaining, all but one of the nine counts of the indictment were dropped in return for a plea of guilty to that one count. Verrusio further agreed to a period of investigative cooperation with the Federal agents. Later, when that cooperation fell through, the original counts growing out of this Florida to Indianapolis incident were refiled and the same motion to suppress was made again. At the 1983 hearing the parties agreed that Judge Steckler should consider the matter on both the hearing before him and the transcript of the earlier hearing before Judge Noland. The government's attorney at both hearings was the same. Verrusio's attorneys were different.

At the first suppression hearing, McGivney testified that he "gave Verrusio his constitutional rights" before the search. He testified that he told Verrusio specifically that he need not consent to a search, that he had a right to require a search warrant and that he did not have to answer any question. Detective Leske of the Indianapolis airport police, testified at the first hearing that immediately after she entered the police room she read Verrusio the standard *Miranda* warning and had him sign a form entitled "Interrogation, Advice of Rights". The record reveals, however, that the "Interrogation, Advice of Rights" form admitted into evidence at the suppression hearing before Judge Steckler had not been signed until after the search of the

suitcase and the seizure of the drugs. This observation is made plausible because of a time notation on the form of 10:30 p.m.

From the testimony of Agent McGivney, it also appears that Verrusio did not consent to a search of his suitcase immediately. Verrusio asked McGivney to ask Detective Leske to leave the room, and when Leske had left, he asked McGivney what the consequences would be if he cooperated. McGivney explained that if any contraband material were found in the suitcase, he would have to arrest Verrusio. McGivney apparently went on to say that if Verrusio did not cooperate, he would bring it to the attention of the United States Attorney and tell the court about it at the time of sentencing. According to McGivney, Verrusio then voluntarily admitted that there were 700 grams of cocaine in the suitcase. McGivney testified that at this time he again explained to Verrusio his Fourth Amendment rights and repeated the warning that if contraband was found in the suitcase, it could be used against him, but that Verrusio still could hold out and thus require him, McGivney, to get a search warrant. Verrusio then consented to the search of his suitcase. Ms. Leske re-entered the interrogation room at this point and brought with her a printed form. This form was entitled "Constitutional Rights Warning: Search by Consent". According to the testimony of the agents, they filled out this form. They had Verrusio read and sign it, and then they signed it. While the time noted on another form, an "Interrogation, Advice of Rights" form, was 10:30 p.m., the time noted on this first form, the "Constitutional Rights Warning: Search by Consent" form was 10:00 p.m. The suitcase then was opened, McGivney seized the cocaine and then "formally" took Verrusio into custody.

## II.

Judge Steckler determined that at least sometime during the early part of Verrusio's detention in that 10 by 12 foot inner office, Verrusio became under arrest and

the full panoply of his constitutional rights were triggered. In the course of his analysis of the facts, Judge Steckler indicated that he was relying on the then recent decision of the Supreme Court in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The point of *Royer* is that in airport cases police exceed the limits of the investigative stop (the *Terry* stop rule) when they remove the suspect from the open areas of the airport into a small police room for further investigation, and in particular do so to get him to let them search his luggage. When they proceed in a manner that would leave the average person with the belief that he is not free to depart, their investigative stop matures into an arrest, triggering the necessity for the *Miranda* warning before any further interrogation or request should proceed. Judge Steckler also relied on this court's own analysis of the several categories of police-citizen encounters and the location of the place among the categories of such encounters where it should be found that an arrest had taken place. This analysis is found in *United States v. Black*, 675 F.2d 129, 133 (7th Cir.1982).

In the *Black* case this Circuit adopted the "reasonable person" test of Justice Stewart's opinion in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), as the appropriate standard for resolving the seizure question. Justice Stewart stated at 554, 100 S.Ct. at 1877:

> "... a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave."

Last year in *United States v. Cordell*, 723 F.2d 1283 (7th Cir.1983) this court decided that even when an airport encounter turns into a detention, it still doesn't necessarily mature into a seizure for which probable cause is needed. Cordell at the time of his encounter was still in a large public area of the airport. It would be presumed that he felt free to turn and walk away.

More recently in *United States v. Morgan*, 725 F.2d 56 (7th Cir.1984), a case in which the defendant was in a busy public area, this court determined from the general conduct of the police that Morgan could have felt free to have turned and left, but rather she remained and gave her consent to the search. We concluded that the encounter had not turned into a seizure.

Finally, this court in *United States v. Notorianni*, 729 F.2d 520 (7th Cir.1984) considered the courteousness of the conduct of the officers in arriving at a decision as to whether or not a detention had matured into a seizure. The officers did not touch the defendant; they did not draw their guns; and Notorianni was asked in a conversational voice for permission to look into his luggage. These facts together with the fact that the encounter took place right along side the concourse in a very public area justified the conclusion that this on-spot search with consent was not a seizure.

■ The case before Judge Steckler was unlike either *Cordell, Morgan, or Notorianni* in that in his case all of the indicia of seizure were present. Verrusio was stopped at an exit by the placing of a hand on his shoulder. He was directed and escorted 50–70 feet by several officers, then taken into a 10 by 12 foot inner room of a police office where he was questioned continuously for almost an hour by one or two agents or officers. The questioning was about the carrying of narcotics and not about conduct which in the interest of public safety would have justified a delay of the time for the giving of the *Miranda* warning. The determination of Judge Steckler that somewhere before any recital of rights had been made, Verrusio himself had been seized, was a proper application of the principal of *Royer* to the case before him.

### III.

Although McGivney testified that he told Verrusio that he need not consent to a search of his suitcase, the documentary evidence shows that the "Interrogation,

Advice of Rights" form was not executed until 10:30–10:35 p.m., approximately 30–35 minutes after the search of the suitcase, and approximately an hour and 15 minutes after his arrival at the airport. Judge Steckler's opinion looked at the facts carefully, noting inconsistencies as to what discussions took place and their placement in time vis-a-vis the signing of the forms—the "Interrogation, Advice of Rights" form and the "Constitutional Rights Warning: Search by Consent" form. The evidence supports his conclusion that before the consent and the search, the detention had matured into a seizure of Verrusio's person following which there was not a timely nor clearly proved giving of the *Miranda* warning.

 On review our role is to accept the district court's factual findings unless they are clearly erroneous. *United States v. Santucci*, 674 F.2d 624 (7th Cir.1982); *United States v. Conner*, 478 F.2d 1320 (7th Cir.1973). The determination of whether the consent to search was free and voluntary must be made with reference to the totality of the circumstances and not merely with regard for whether one form or another was signed. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

The trial judge has the opportunity to observe the demeanor of the witnesses and to assess their credibility. It was peculiarly within the scope of his responsibilities to weigh any conflicts in the evidence. His discussion of these conflicts bears witness to his performance of that responsibility. His decision that Verrusio had not been given all of his rights before his personal seizure further matured into an evidentiary seizure is amply supported by the evidence and in particular by the time notation on the "Interrogation, Advice of Rights" form. The judge's decision reflects what appear from the record to have been a lack of credibility on the part of the agents and irreconcilable inconsistencies between the narrations of events by Agent McGivney and Officer Leske. Finally, the propriety of this decision collaterally was corroborated by an exhibit the judge admitted into evidence. It was a government report excluded from discovery by Agent McGivney. This report stated that the government initially declined prosecution based on Assistant United States Attorney Kennard Foster's decision that the evidence could not be used because the search of Verrusio's suitcase was faulty.

We find that the district court approximately granted the defendant's motion to suppress. Accordingly, the decision is affirmed.

AFFIRMED.